IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>CARLOS NAVARRO-MERCADO,<br>*Defendant.* | Criminal No. 16-806 (JAG) |

**SENTENCING MEMORANDUM**

**TO THE HONORABLE JUDGE JAY A. GARCIA-GREGORY**
**UNITED STATES DISTRICT JUDGE**
**FOR THE DISTRICT OF PUERTO RICO**

  **COMES NOW** defendant, **Carlos Navarro-Mercado "Mr. Navarro,"** represented by the Federal Public Defender for the District of Puerto Rico and before this Honorable Court respectfully states as follows:

  Mr. Navarro pleaded guilty to the one-count indictment for violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. He did so by way of a straight plea, having no agreement with the Government. Mr. Navarro offers the following in mitigation of his conduct and in support of his request for a downward variance and a sentence of probation.

  I.  **History and Characteristics**

  Mr. Navarro is charged as a felon in possession of a firearm. He is a felon because of a 2002 conviction under Article 95 of the Puerto Rico Penal Code. But, Mr. Navarro is much more than his previous conviction. His prior case is approximately sixteen years old, and since then Mr. Navarro has lived an extremely productive, law-abiding, and family-oriented life in the free community. He is an active and loving father, a hard and ambitious worker, and an integral member of his community.

Mr. Navarro as a Father



*(Mr. Navarro with his son, Yadiel)*

Mr. Navarro is the father of a thirteen year old boy. Yadiel A. Navarro lived with his mother, Karem A. Gonzalzez-Chambis until Hurricane Maria. Both mother and son have always enjoyed a close relationship with Mr. Navarro, who is actively and enthusiastically co-parenting his son with Ms. Gonzalez. Before the hurricane, Mr. Navarro mostly saw Yadiel every day. He and Ms. Gonzalez arranged for shifting custody, one weekend on and one weekend off, but Mr. Navarro hated to let a day go by without at least a visit. Ms. Gonzalez states that Mr. Navarro is a good father who has taken an active role in his son's life. She worries about the damage to her son that will result from their separation. Though they are no longer a couple, Ms. Gonzalez states that she and Mr. Navarro are successfully raising their son together, that Mr. Navarro has always treated her with respect, and that Mr. Navarro is supporting Yadiel financially.

Yadiel survived the passage of Hurricane Maria with Mr. Navarro. Afterwards, when Mr. Navarro made contact with Ms. Rodriguez, they agreed that Yadiel would stay with Mr. Navarro for the foreseeable future, until "things get better." Ms. Gonzalez has two younger children, and has struggled to provide for them, like so many others on the island, in the aftermath of the storm. Difficulties such as poor communication, transportation, work conditions, the diminished availability of potable water and nutritious food led Mr. Navarro and Ms. Gonzalez to conclude that Yadiel is better off right now with Mr. Navarro, especially because father and son have always gone to such lengths to spend as much time together as possible anyway.

Yadiel is a burgeoning athlete. He competes on a volleyball team and Mr. Navarro has rarely missed a game, tournament, or an opportunity to support his son.

 

*(Mr. Navarro with Yadiel at volleyball tournaments)*

## Successful Pretrial Supervision

Mr. Navarro was granted bail in this case back in December, 2016. Since that time, Mr. Navarro has complied perfectly with his pretrial release conditions. The Court imposed 30 days of electronic monitoring, but Mr. Navarro did not seek termination of the electronic monitoring condition for more than five months because he was eager to demonstrate his compliance with the Court's orders, his willingness and ability to comply with the conditions imposed, and his gratitude for release on bail conditions and the resulting time and access he had to his son. In May, 2017, the Court removed this condition upon Mr. Navarro's request so that he could attend Yadiel's volleyball tournaments and games.

Once the electronic monitoring condition was lifted, Mr. Navarro continued to comply with the other conditions of his release. He has been working since his arrest as a driver's assistant for Luis Martinez of Martinez Transport. Mr. Navarro works four days a week from 7:009AM until 4:30PM and has not missed a day of work. Mr. Navarro's employer certifies that he is responsible for loading and unloading merchandise for delivery at supermarkets in the metropolitan area. Mr. Navarro enjoys this job and is very scared that he will lose it if he is away for too long. Because he was released on bail, Mr. Navarro has been able to maintain his employment by obtaining permission to continue with his job.

Mr. Navarro has always been gainfully employed as a truck driver, but is not currently driving one himself due to his suspended driver's license. To that end, Mr. Navarro has also been working to get his driver's license back. He set up a payment plan to satisfy his debt to the municipality for old tickets in order to reinstate his license. He has communicated with his boss about this effort, who has indicated that when Mr. Navarro is licensed again, he can resume work with the company as a driver.

## Support of his Community

Mr. Navarro has enjoyed the love and support of his family throughout this case. His family is close, especially since Hurricane Maria, and they report that they have been grateful to have Mr. Navarro with them during this time. Mr. Navarro was raised well by his father and step-mother. His mother died of cancer when he was only five years old, but Mr. Navarro did not want for familial love and support. Mr. Navarro's step-mother is currently receiving treatment on the mainland of the United States for a heart condition, so Mr. Navarro is now responsible for the support of his aging father.

Mr. Navarro's sister, Ana Navarro-Mercado wishes to inform the Court that her brother is a good person, a hard worker, and an excellent father, son and brother. She informs that he has been living with and caring for their father, helping him with everything he needs. Their father depends on Mr. Navarro now more than ever. Similarly, Ms. Inga Reyes, a neighbor who has known Mr. Navarro his whole life, confirms that he has been living with his father. She states that Mr. Navarro's father is elderly and relies on him, and that she knows Mr. Navarro to be kind, helpful, and a hard-worker. Several other friends and neighbors have expressed similar sentiments and support for Mr. Navarro. The Court should consider that this community of people who have been steadfast in their support and affection for Mr. Navarro will facilitate his success and reintegration upon the conclusion of this case.

## II.     The Nature and Circumstances of the Offense

To Mr. Navarro, the firearm that he possessed in this case was nothing more than a prop; a theatrical tool that he believed he would never have to use. In fact, Mr. Navarro never used this firearm. He kept it in his truck because he worked in the early morning until late at night loading and unloading the truck, and making deliveries in dangerous areas. Mr. Navarro considered

himself to be in a vulnerable position while working because truck drivers had become common targets for early-morning robberies. He was scared because the news reported that there were various attacks on trucks and drivers.

The best evidence that Mr. Navarro never would have used this firearm for anything more than a last resort attempt at intimidation is the fact that it was unloaded and Mr. Navarro was not found with bullets that would fit the firearm. The firearm itself is old and clearly not maintained for use.

Inspection of this firearm revealed that it had an obliterated serial number; a fact which played no part in Mr. Navarro's decision to select and purchase the firearm. Mr. Navarro did not set out to possess a firearm with an obliterated serial number, but that is what was available to him. Neither had he contemplated that such a firearm was somehow more unlawful. In Mr. Navarro's case, this fact was merely incidental to the offense, not an element of it.

The United States Sentencing Guidelines do not contemplate Mr. Navarro's lack of specific intent to possess a firearm with an obliterated serial number. Instead, the USSG mechanistically imposes the enhancement under a strict liability framework. Unlike 18 U.S.C. § 922(k), the federal offense which criminalizes the possession of a firearm with an obliterated serial number and specifically carries a scienter requirement, § 2K2.1(b) of the USSG does not require any scienter requirement for the enhancement. This distinction, though not illegal under the applicable caselaw, supports a downward variance in the interest of equity, fairness, and sentencing in accordance with the goals of sentencing.

### III. Acceptance of Responsibility

These facts are not to excuse Mr. Navarro's conduct in this case, but to provide context for his behavior. Mr. Navarro accepted responsibility for his conduct and recognizes that he violated

the law by having a firearm in his possession. He articulated this acceptance of responsibility at his Presentence Investigation Report interview, stating that he regrets his behavior and did not benefit in any way. He also realizes that as a result of this case, he risks time away from his family, especially his son. Mr. Navarro, more than anything, hopes to continue being present for Yadiel during adolescence in order to raise him to be a good person and to avoid the mistakes that he has made.

Mr. Navarro regrets the decision to arm himself because it was an unnecessary precaution that cost him a lot. He is focused on making better decisions. He states that he has learned a lot about making conscious decisions for himself and his son, and begs the Court for the opportunity to remain in his son's life as his primary caretaker so that he won't have to grow up without a father.

## IV.     Recommendation for Alternative Sentencing

A term of imprisonment is not always necessary. In fact, often, it is "not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Congress has acknowledged that the purposes of sentencing are sometimes best served by alternatives to prison. S. Rep. No. 98-225 at 119, n. 415. Similarly, in *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court recognized that a sentence of imprisonment in some cases may even promote "derision of the law" when viewed to impose harsh punishment if not warranted. Certain offenses and offenders are not eligible for alternative sentencing. Neither Mr. Navarro nor his offense are one of them. 18 U.S.C. 922(g) has a statutory maximum of ten years, but no mandatory minimum sentence. Especially after *United States v. Booker*, 543 U.S. 220 (2005), the Court has not only the discretion, but the obligation, to make an individualized assessment as to whether a sentence of imprisonment is appropriate.

Mr. Navarro is a 42 year old man. He is gainfully employed and has a stable and happy living situation. He enjoys the support of a loving and close-knit community. His only criminal conviction is very old. He is not plagued by family or marital problems. He is not addicted to drugs, he has no mental illness, and the instant offense involves neither violence nor malice. All of these factors yield a diminished risk of recidivism and an increased likelihood of successful reentry.[1] The Sentencing Commission encourages the Court to consider recidivism rates in contemplating alternative sentencing in recognition of the problems of mass incarceration and overcrowding, and the cost of incarceration.[2] As such, the Court should consider this social science and the corresponding empirical data against the backdrop of Mr. Navarro's assertions that he has learned his lesson, will not repeat the instant offense, and desperately desires a second chance to conclude that the Court need not impose a prison sentence in this case in order to deter future offenses.

Beyond recidivism considerations, the Court should note that empirical research shows no relationship between sentence length and deterrence. Outgoing Attorney General Eric Holder noted that the still-growing rates of incarceration are having little effect on crime rates.

> While prison building and prison spending continue to increase, public safety is not improving. Since 2003, spending on incarceration has continued to rise, but crime rates have flattened. Indeed, crime rates appear to have reached a plateau, and no longer respond to increases in incarceration.[3]

---

[1] See e.g., "Recidivism Among Federal Offenders: A Comprehensive Overview," United States Sentencing Commission, Kim Steven Hunt and Robert Dumville, March, 2016.

[2] "The federal prison population today is slightly under two hundred thousand inmates (which is around one-eighth of the total prison and jail population in the United States. As these numbers have grown, courts and correctional officials have sought greater information about reoffending." *Id*. at 3.

[3] Remarks as prepared for delivery by A.G. Eric Holder at the Vera Institute of Justices' Third Annual Justice Address. Available at http://www.vera.org/pubs/remarks-prepared-attorney-general-eric-h-holder-jr-vera-institute-justices-third-annual-justice (last visited March 3, 2014).

The Brennan Center for Justice released a report in February of 2015, in which it concluded that "increased incarceration has had no effect on the drop in violent crime in the past 24 years."[4] In fact, "increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century."[5] Thus, it is not the length of sentence, but rather the certainty of sentence, that effectuates the deterrent effect. The Court can rest assured that a sentence of probation, the corresponding limitations on Mr. Navarro's liberty and effects on his everyday life, along with the many collateral consequences of a felony conviction, constitute severe punishment for him.

The Court should consider that conditions of supervised release and the threat of imprisonment if Mr. Navarro violates them, also deter future misconduct. This process, from arrest, to bail hearing, to successfully and good-naturedly living under the albatross of electronic monitoring despite the limits it placed on his relationship with his son, to guilty plea, PSR interview, to preparation for sentencing and the specter of a lengthy prison term and separation from the people who need him most, have left Mr. Navarro with an acute awareness of his responsibility to remain strictly within the four corners of the law, and never to stray beyond them again.

A sentence of imprisonment will undermine rather than further the § 3553(a) factors in this case. Specifically, Mr. Navarro is presently employed, and risks losing his job if incarcerated. Mr. Navarro is presently the primary caretaker for his son, who will be harmed more than anyone if

---

[4] Dr. Oliver Roeder, Lauren Brooke-Eisen and Julia Bowling. Brennan Center for Justice. *What Caused the Crime Decline?* (2015) at Page 15. *available at* https://www.brennancenter.org/publication/what-caused-crime-decline
[5] Id.

Mr. Navarro is incarcerated. Mr. Navarro is presently caring for his aging father, who will be left on his own if Mr. Navarro is taken from his home. Mr. Navarro's history and characteristics mitigate in favor of alternative sentencing because he has shown himself to be a responsible and selfless member of his family and community. The nature and circumstances of the offense do not indicate the need for a prison sentence because there was no victim, no violence, and no exacerbating circumstances. Instead, Mr. Navarro cooperated with police and was forthcoming in his interview. He did not resist arrest or fail to submit to the authority of the police, the Court or the USPO.

Finally, and arguably most tellingly, Mr. Navarro has been successfully complying with supervision since December, 2016. For more than a year he has followed all the directions and instructions of the Court and the USPO. He has demonstrated a respect for authority, remorse for his conduct, and willingness to submit to any and all conditions imposed upon him.

The Sentencing Reform Act instructs the Court to consider the applicability of alternative sentences. 18 U.S.C. § 3553(a)(3). Because the Guidelines are not mandatory, the "range of choice dictated by the facts of the case is significantly broadened." *Gall v. United States*, 552 U.S. at 58. In this case. Mr. Navarro is only a criminal history category (CHC) I. He committed a non-violent offense in which there was no victim. He quickly and unequivocally accepted responsibility for his conduct. He has demonstrated his respect for the authority of the Court, the USPO, and the law by complying with all pretrial release conditions, before, during and after Hurricane Maria. He has demonstrated his value to his family and his community, and the quality and productivity of his life in the free community. Finally, and most importantly, he is excelling in his responsibilities as a father. He takes his role as a father seriously, and lives in fear of the damage to his son that would result if they were separated by a period of incarceration.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to the parties of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 15th day of January, 2018.

        **ERIC ALEXANDER VOS**
        **Chief Defender**
        **District of Puerto Rico**

        S/Samantha K. Drake
        SAMANTHA K. DRAKE
        **USDC-Government No. G02410**
        **A.F.P.D. for Defendant**
        **241 Franklin D. Roosevelt Avenue**
        **Hato Rey, PR  00918-2441**
        **Tel. (787) 281-4922 / Fax (787) 281-4899**
        **E-mail:** samantha_drake@fd.org